# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF THE APPLICATION  :
OF THE UNITED STATES OF AMERICA  :
FOR AUTHORIZATION TO OBTAIN  :  Magistrate No. *16-259-M*
HISTORICAL AT&T "NELOS" GPS DATA  :
FOR CELLULAR TELEPHONE  :  FILED
ASSIGNED CALL NUMBER 484 547-7489  :
                                                            MAR - 2 2016

**ORDER**
                                                    MICHAEL E. KUNZ, Clerk
                                                    By_____Dep. Clerk

This matter having come before the Court pursuant to an application by the government

under Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Sections 2703(c)

and (d), requesting an order authorizing the disclosure by AT&T, a telecommunications and

wireless telephone service provider headquartered in West Palm Beach, Florida, of data as

follows:

records or other information pertaining to the mobile telephone number (484)

547-7489, a mobile telephone number issued by AT&T and used by VICTOR MORALES

(hereinafter the "Subject Telephone Number"); and UPON REVIEW OF THE APPLICATION,

THE COURT HEREBY FINDS THAT:

AT&T's historical Network Event Locator System ("NELOS") contains historical

GPS data concerning the physical location of devices.  With NELOS, AT&T provides the date,

time, latitude, longitude, and location accuracy of the network event, along with other subscriber

information.   This information is distinct from information provided in traditional call detail

records and cell site information.

THE COURT FURTHER FINDS THAT pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(B) and 2703(d), Affiant has offered facts establishing probable cause that AT&T's NELOS information will provide evidence of criminal activity;

THEREFORE, IT IS HEREBY ORDERED, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(B) and 2703(d), that AT&T, shall provide the NELOS data for the Subject Telephone Number for the following dates and times:

o   May 7, 2015 from 10:30 p.m. to May 8, 2015 12:30 a.m.;

o   May 14, 2015 from 8:00 p.m. to 11:30 p.m.; and

o   May 26, 2015 from 7:30 p.m to 9:30 p.m.

This order permits obtaining information used to locate a mobile device at a specific time potentially with GPS-like accuracy.

IT IS FURTHER ORDERED that AT&T be compensated by the investigative agency for reasonable expenses directly incurred in providing technical assistance.

DATED: 3/2/2016

_____
HONORABLE HENRY S. PERKIN
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN THE MATTER OF THE APPLICATION** | : | |
| **OF THE UNITED STATES OF AMERICA** | : | |
| **FOR AUTHORIZATION TO OBTAIN** | : | **Magistrate No.** *16-259-M* |
| **HISTORICAL AT&T "NELOS" GPS DATA** | : | |
| **FOR CELLULAR TELEPHONE** | | FILED |
| **ASSIGNED CALL NUMBER 484 547-7489** | : | |

MAR - 7 2016

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

**AFFIDAVIT OF PROBABLE CAUSE IN SUPPORT OF
AN ORDER FOR AT&T NELOS DATA**

I, Timothy P. Shelton, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for an order under Federal Rule

of Criminal Procedure 41 and 18 U.S.C. §§ 2703(d) for information concerning AT&T's

historical Network Event Locator System ("NELOS") data of the cellular telephone assigned call

number (484) 547-7489 (hereinafter referred to as the "Target Number"), whose service provider

is AT&T, a wireless telephone service provider headquartered in West Palm Beach, Florida. The

Target Number is described herein and in Attachment A, and the information to be seized is

described herein and in Attachment B.

2.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms &

Explosives (ATF), and have been so since August 2003.  I am currently assigned to the ATF

Reading Field Office and some of my responsibilities include the investigation of federal

firearms laws and violent crime.  During my tenure as an ATF agent, I have obtained several

federal search warrants, which have resulted in the seizure of firearms, narcotics, drug proceeds

and other contraband.  I have conducted and participated in numerous investigations, which

have resulted in the arrest and prosecution of individuals who have committed violations of federal law, including armed Hobbs Act robbery, firearms offenses, and illegal narcotics trafficking.

3.     The facts in this affidavit are from my personal knowledge as acquired during the investigation of violations of federal criminal law. Other information in this affidavit comes by way of my training and experience and information obtained from other agents and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §1951 (herein referred to as Target Offenses) have been committed by Victor MORALES and others.   There is also probable cause to believe that NELOS information described in Attachment B will produce evidence of the Target Offenses.

## PROBABLE CAUSE

5.     Between May 7, 2015 and May 29, 2015 there was a string of eight (8) armed robberies that occurred in Allentown, Pennsylvania.  Each of the eight robberies was committed by a team of two to three armed robbers who entered the businesses that were robbed (in addition to, on some robberies, a lookout positioned outside of the business that was robbed).  These businesses consisted of a gas station and seven smaller convenience stores.  Each establishment was engaged in trade in or affecting interstate or foreign commerce.

6.     The eight robberies all took place in Allentown, Pennsylvania, as follows: (i) Sun's Deli, located at 1341 Union St., on May 7, 2015 at 2105 hours; (ii) N 7th St Market, located at 407 N 7th St., on May 7, 2015 at 2339 hours; (iii) M&J Grocery, located at 448 N 2nd

2

St., on May 14, 2015 at 2117 hours; (iv) Betty Mini Market, located at 922 W Chew St., on May 14, 2015 at 2155 hours; (v) 10th St. Market, located at 802 N 10th St., on May 21, 2015 at 2030 hours; (vi) M&J, located at 448 N 2nd St., on May 26, 2015 at 2035 hours; (vii) Dominguez Market, located at 517 W Gordon St., on May 26, 2015 at 2057 hours; and (viii) Speedway gas station, located at 1043 Lehigh St., on May 29, 2015 at 2258 hours.

7.      Many of the robberies were captured by videotaped surveillance.  The robbers followed a similar pattern in all of the robberies.  Two or three robbers entered one of the commercial establishments wearing masks, gloves and dark clothing to hide their identity. Additionally, each robber in the store was armed with a revolver or pistol.  On each occasion, the robbers stole U.S. currency from the store's register, and on many of the robberies, they also stole cellular telephones, T-Mobile pre-paid phone cards and cigarettes.  The Allentown Police Department led the investigation of the robberies and ultimately arrested two individuals for their participation in some of the robberies and two other individuals for unlawful possession of firearms.  Victor MORALES, a convicted felon, and one of the individuals suspected of involvement in several of the aforementioned robberies, was arrested on June 12, 2015 by the Allentown Police Department for violating Pennsylvania's firearms laws.

### Evidence of MORALES' Participation in Robberies

*i. Robbery of the North 7th Street Market (407 N 7th Street, Allentown, PA – May 7, 2015 at approximately 11:30 p.m.)*

8.      On May 7, 2015, the Allentown Police Department responded to an alarm activated at the North 7th Street Market, located at 407 North 7th Street in Allentown, Pennsylvania.  The store had been robbed by three masked individuals brandishing firearms.

3

Witnesses stated that the robbers entered the store wearing all black and covering their faces with masks and bandanas. One of the robbers jumped over the counter to force the clerk to empty the register while the other two robbers brandished firearms to keep the customers in the store at bay. The clerk estimated that he handed the robber approximately $6,000 in cash and some checks of undetermined value.

9.      On October 19, 2015, the Allentown Police Department and I interviewed a confidential informant ("CI 1") about several robberies in Allentown, Pennsylvania. CI 1 told us that he participated with MORALES and others in the May 7, 2015 robbery of the North 7th Street Market. CI 1 stated that he, another individual and MORALES entered the North 7th Street Market each brandishing firearms while a fourth individual remained outside the convenience store and served as a lookout.

10.     CI 1 stated that on May 7, 2015, before the robbery of the North 7th Street Market, while inside the residence at 324 North Law Street with others, including MORALES, CI 1 observed three individuals arrive at the 324 North Law Street residence and state that they had just robbed a convenience store in Allentown. CI 1 further observed that these three individuals were in possession of cash, an Apple iPhone, cigarettes and cigars that they said they had recovered from the robbery. CI 1 also noticed that the three robbers were in possession of dark clothing ostensibly used during the robbery and two firearms, that is a Ruger .380 caliber pistol and a "Deuce 5."

4

11.     CI 1 told us that after hearing about the details of the robbery from these three individuals, MORALES told CI 1 it was their turn to rob a store.  CI 1 then stated that four individuals, including CI 1 and MORALES, participated in a subsequent robbery.

12.     CI 1 stated that the four individuals participating in the robbery walked from the 324 North Law Street residence to the North 7th Street Market.  CI 1 carried a .380 caliber pistol. MORALES also carried a gun to the robbery, though CI 1 could not recall the manufacturer or caliber.

13.     CI 1 further stated that the four robbers proceeded to the North 7th Street Market and donned their masks as they approached the convenience store's entrance.  MORALES instructed CI 1 to jump over the counter to obtain money from the register once the three robbers entered the convenience store.  The plan further involved a fourth robber positioning himself outside the North 7th Street Market to act as a lookout.   CI 1 stated he was reluctant at the time to hurdle the counter and take money from the register, but that he did as instructed by MORALES and jumped over the counter once he, MORALES and a third confederate entered the convenience store.  After hurdling the counter, CI 1 ordered the clerk to empty the register. The convenience store clerk handed CI 1 cash from the register.  CI 1 also stated that he injured his ankle jumping over the counter, either at the beginning of the robbery, at its conclusion, or both.

14.     CI 1 could not recall the exact amount of money stolen during the May 7, 2015 North 7th Street robbery, but CI 1 did recall that the money was divided between the four

5

robbers, and that $100 from the total cash stolen was contributed to a general 324 N Law Street "house" fund. CI 1 told us that CI 1 received approximately $20 for participating in the robbery.

15.    When asked whether CI 1's weapon was loaded, CI 1 stated that a fellow confederate, who had lent CI 1 a firearm for the robbery, told CI 1 the pistol was loaded and had "one in the head," indicating that the firearm was loaded and a round was chambered. CI 1 also mentioned that MORALES frequently checked to ensure that his own weapon was loaded.

*ii. Robbery of Betty Mini Market (922 Chew Street, Allentown, PA – May 14, 2015 at approximately 10:00 p.m.)*

16.    On May 14, 2015, The Allentown Police Department responded to a report of an armed robbery in progress at Betty Mini Market, located at 922 Chew Street, Allentown, Pennsylvania. The store owner told investigating officers that two males, each over six feet tall, entered the store brandishing firearms and ordered the patrons to the ground. The robbers then proceeded to take money from the store register.

17.    The owner of Betty Mini Market further recounted to the investigating officers what had transpired. The owner stated that the owner was behind the counter manning the register when two males rushed into the store each with gun drawn. After forcing two patrons to the ground, the robbers demanded that the owner give them money from the register. The owner reported that the robbers stole the owner's cellular telephone and an unknown quantity of U.S. currency from the register. Additionally, the robbers forcibly took $65 in U.S. currency from one of the customers in the store at the time of the robbery.

6

18.     Recorded video surveillance of the May 14, 2015 robbery of Betty Mini Market corroborates the account given by the owner of the store. The video portrays two masked individuals entering the store each carrying a handgun. The first robber to enter the convenience store ("Robber 1") wore a black hooded-sweatshirt, and a black mask covering the lower portion of his face. The second robber to enter the store behind Robber 1 ("Robber 2") is taller than Robber 1. Robber 2 like Robber 1 wore a black hooded-sweatshirt, and a black mask covering the lower portion of his face. Robber 1 is captured by the video surveillance orally engaging the cashier, in a manner appearing to demand money. Robber 2 keeps the convenience store customers at bay with a firearm while Robber 1 demands money from the cashier. Robber 1 goes behind the counter and takes cash from the store register. Robber 1 also takes what appears to be a cellular telephone from the top of the register. As the robbers leave the store, Robber 1 appears to take something out of the hands of a customer who is lying on the ground in front of the register. A third individual is captured by the video surveillance outside the convenience store acting as a lookout.

19.     The Allentown Police Department investigated the May 14, 2015 Betty Mini Market robbery and determined from the video surveillance of the robbery that the getaway vehicle was a dark blue, early model Lexus sedan. In addition, the Allentown Police Department received an anonymous tip identifying by name an individual who allegedly had committed several robberies in or around Allentown using a stolen blue Lexus as a getaway car. The Allentown Police Department interviewed that individual (confidential informant, or "CI 2"), who admitted to his involvement in some of the robberies including the May 14 robbery of Betty

7

Mini Market. CI 2 told investigators that MORALES[1] and another individual robbed Betty Mini Market while CI 2 remained in a vehicle as the getaway driver.

20.     On June 15, 2015, Allentown Police Department Detective Raymond Ferraro and I interviewed MORALES about his involvement in a string of robberies. During the interview, MORALES confessed to participating in the robbery of Betty Mini Market on May 14, 2015. He admitted he entered Betty Mini Market on that date brandishing a firearm. When shown a still photograph from the Betty's Mini Market store surveillance camera capturing the robbers during the robbery, MORALES identified himself as one of the robbers in the photograph wearing a mask and brandishing a firearm.

*iii. Two robberies of M&J (448 N 2ⁿᵈ Street, Allentown, PA – May 14, 2015 at approximately 9:15 p.m. and May 26, 2015 at approximately 8:30 p.m.)*

21.     During his June 15, 2015 interview, MORALES stated that he might have been in a car during a possible additional robbery on May 14 that occurred on 2nd and Liberty Streets in Allentown, PA. M&J Market, 448 North 2nd Street, is located at this intersection. M&J was robbed on two separate occasions -- May 14 and May 26, 2015. During the interview, MORALES was evasive about the May 14 robbery of M&J, offering that he was in a car with several other individuals near M&J that evening, and further stating that although several people were in the car and might have committed a robbery that evening, he did not participate in a

---

[1] CI 2 referred to Morales by Morales' nickname "Self." When shown a photograph of Morales, CI 2 identified MORALES as the individual he referred to as "Self."

8

robbery. MORALES did admit that he knew M&J was robbed on May 14; he denied knowledge of a later robbery at M&J.

22.     During an interview with law enforcement, CI 2 stated that MORALES was present and had knowledge of both the May 14 and May 26 robberies of M&J.

23.     During the October 19, 2015 interview with law enforcement, CI 1 stated that CI 1, CI 2, MORALES and another individual went in an automobile to M&J to rob the convenience store on May 26, 2015. CI 1 further stated that he and another individual ran into the store brandishing firearms while MORALES and CI 2 stayed in the car. CI 1 further admitted that he demanded money from the cashier while his confederate in the store demanded money from a store patron. CI 1 stated that the robbers obtained approximately $150 from the robbery, about $40 of which CI 1 kept. CI 1 used a Hi Point 9 mm pistol during the robbery while the confederate in the store used a Ruger .380 caliber pistol. CI 1 further stated that MORALES handed out the firearms to them before the robbery and also gave them black clothing to wear. CI 1 told investigators that before the May 26 robbery of M&J took place, MORALES, while preparing CI 1 for the robbery, told CI 1 that MORALES had robbed M&J before May 26, 2015 and that CI 1 had to rob the store again because MORALES needed another "strap," a reference to a firearm.

### June 12, 2015 Arrest of MORALES

24.     On June 12, 2015, CI 2 was "consensualized" under Pennsylvania's wiretap laws, that is, CI 2 agreed to allow his cellular phone conversation with MORALES to be recorded by the Allentown Police Department. CI 2 called MORALES, who told CI 2 that he was interested

9

in committing another robbery that evening with another confederate and that MORALES and the other confederate would need CI 2 to participate as the getaway driver. CI 2 then exchanged text messages with the confederate, who agreed to participate in the robbery. Following CI 2's recorded cellular phone conversation with MORALES, this confederate contacted CI 2 on CI 2's cellular phone and asked CI 2 to pick him up on the 100 block of Green Street in Allentown, after which the two would pick up MORALES on the 300 block of Law Street. CI 2 then drove to the 100 block of Green Street to pick up the confederate. Despite the earlier demonstrated interest, the confederate declined to participate in the robbery.

25.     CI 2 then drove to 324 Law Street to pick up MORALES. MORALES and CI 1 entered the car driven by CI 2. Shortly thereafter, members of the Allentown Police Department Emergency Response Team intercepted the vehicle and arrested MORALES and CI 1.

26.     MORALES and CI 1 were arrested near 324 North Law Street, Allentown, Pennsylvania. MORALES was seated in the passenger seat of the vehicle and CI 1 in the rear of the vehicle. Two firearms were recovered from the vehicle, that is, (i) a Bersa, Model Thunder 380, .380 Caliber pistol, bearing serial number: B51098; and (ii) a Smith and Wesson, Model SW40GVE, .40 caliber pistol, bearing serial number: RBA0822. The officers observed the Smith & Wesson pistol in plain view on the front passenger seat where MORALES had been seated. A search of the vehicle incident to arrest revealed the Bersa pistol in the rear passenger compartment of the vehicle on the floor near where CI 1 had been seated.

27.     On June 12, 2015, following the arrest of MORALES and CI 1, the Allentown Police Department obtained a search warrant for 324 N Law Street from Pennsylvania Court of

10

Common Pleas Judge Maria Dantos and executed the warrant on the residence.  Nickaury

DEJESUS, a tenant of the residence, told law enforcement officers that she had given her

boyfriend MORALES two firearms before he left the residence that evening.  DEJESUS further

told law enforcement officers that there were numerous other firearms in the residence.  Local

authorities executing the search warrant recovered, among other articles and contraband, an

Apple iPhone 4S.  That Apple iPhone was linked to the subscriber number: (484) 547-7489.  I

learned from CI 2 that cellular phone number (484) 547-7489 is used by "Self," i.e.,

MORALES.

28.     On October 26, 2015, I interviewed WB, the owner of the North 7th Street Market

to determine if the business was involved in or affected interstate or foreign commerce.  The

owner explained that many of the grocery items stocked on the convenience store's shelves were

purchased and delivered from Krasdale Foods Inc., a grocery supply company located in the

Bronx, New York.

29.     On October 26, 2015, I interviewed RA, co-owner of Betty's Mini Market to

determine if the business was involved in or affected interstate or foreign commerce.  RA stated

that the store sells various products produced by Goya Foods, a family-run food company and

distributor.  RA stated that Goya Foods products are delivered regularly to Betty's Mini Market

from a location in New Jersey.

30.     On October 26, 2015, I interviewed ZP, owner of M&J Market to determine if the

business was involved in or affected interstate or foreign commerce.  ZP stated that the store

receives monthly shipments of juices and sodas from New Jersey and sells these products in the

11

store. Additionally, ZP informed us that M&J receives shipments from several national food product brands, including Wise Chips, Frito Lay and Drakes Cakes.

31.     Based on my training and experience, I know that AT&T is equipped to collect data through AT&T's Network Element Locator Service, also known by its acronym, NELOS. NELOS contains historical GPS data concerning the physical location of devices. With NELOS, AT&T provides the date, time, latitude, longitude, and location accuracy of the network event, along with other subscriber information. This information is distinct from information provided in traditional call detail records and cell site information. I have learned from an expert in the field of cellular telephone technologies, who is familiar with and has recovered NELOS data on prior occasions, that AT&T's NELOS application is capable of recovering data, including latitudinal and longitudinal coordinates, so long as the cellular telephone at issue is powered on.

32.     In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that people who engage in the types of crimes discussed above, including armed robberies, often use cellular telephones to communicate with co-conspirators before, during and after such crimes and in furtherance of their criminal activities, to plan, prepare for, and execute the crimes. In addition to which, such people in my experience carry their cellular telephones with them and keep them powered on during the commission of such crimes. Only after careful analysis of all historical originating and terminating call detail records, cell site information, and NELOS information, can reasonable inferences be drawn as to the operator of a specific cellular telephone. Additionally, analysis of historical originating and terminating call detail records, cell site information, and

12

NELOS information can assist law enforcement in determining whether others may have been involved in the criminal activity. In this case, such information could corroborate the other evidence regarding the whereabouts of the defendants during the time they were preparing for the crime, executing the crime, and fleeing after commission of the crime.

33.     Based on my training and experience, I believe the NELOS data will contain evidence of MORALES' violations of federal criminal offenses, including but not limited to, Title 18 U.S.C. § 1951 (Hobbs Act robbery).

### AUTHORIZATION REQUEST

34.     Based on the foregoing, I request that the Court issue the proposed order, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(d). I request that the Court direct AT&T to disclose to the government any information described in Attachment A that is within the possession, custody, or control of AT&T.

Respectfully submitted,

Timothy P. Shelton
Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives

Subscribed and sworn to before me on the

21 day of March, 2016

HONORABLE HENRY S. PERKIN
UNITED STATES MAGISTRATE JUDGE

13

## ATTACHMENT B

### Items to be Seized

Network Element Locator Service (NELOS) information, for Target Number described in Attachment A for the following time periods:

- May 7, 2015 from 10:30 p.m. to May 8, 2015 12:30 a.m.

- May 14, 2015 from 8:00 p.m. to 11:30 p.m.

- May 26, 2015 from 7:30 p.m to 9:30 p.m.